Edward and Shirley Ann WATSON, as Individuals and on behalf of all others similarly situated, Plaintiffs,

v.

BRANCH COUNTY BANK, Individually and on behalf of all others similarly situated, and Security National Bank, Battle Creek, Michigan, Defendants.

No. K-89-72 C.A.

United States District Court,
W. D. Michigan, S. D.

Aug. 12, 1974.

William L. Coash, Legal Aid Society of Calhoun County, Battle Creek, Mich., for plaintiffs.

Richard F. Biringer, Coldwater, Mich., Grant J. Gruel, Grand Rapids, Mich., for Branch County Bank.

William R. Worth, Battle Creek, Mich., for Security National Bank.

## MEMORANDUM OPINION AND ORDER

FOX, Chief Judge.

This is a challenge to the constitutionality of the self-help repossession and disposition provisions of the Uniform Commercial Code, Sections 9–503 and 9–504, enacted in Michigan, M.C.L.A. Secs. 440.9503 and 440.9504, M.S.A. Secs. 19.9503 and 19.9504 [hereafter cited as UCC 9–503 and 9–504][1] as applied to automobiles.

Each of the named plaintiffs is an owner of an automobile which was subject to a security interest held by one of the named defendants, and which was repossessed without previous notice and opportunity for judicial hearing, as authorized by UCC 9–503 and 9–504. Defendants Branch County Bank of Coldwater, Michigan, Security National Bank and Michigan National Bank are corporations organized under the laws of Michigan. Each is licensed under the Motor Vehicle Sales Finance Act, M.C.L.A. Sec. 492.101 et seq., M.S.A. Sec. 23.628(1) et seq.

The plaintiffs allege that self-help repossession of automobiles subject to security agreements by the named defendants as authorized by UCC 9–503 and 9–504 deprives them of their property without due process of law contrary to the Fourteenth Amendment of the United States Constitution[2] and the implementing civil rights statute, 42 U.S.C. Sec. 1983.[3] The plaintiffs seek a decla-

---

1. UCC 9–503 reads as follows:
"Sec. 9503. Unless otherwise agreed a secured party has on default the right to take possession of the collateral. In taking possession a secured party may proceed without judicial process if this can be done without breach of the peace or may proceed by action. If the security agreement so provides the secured party may require the debtor to assemble the collateral and make it available to the secured party at a place to be designated by the secured party which is reasonably convenient to both parties. Without removal a secured party may render equipment unusable, and may dispose of collateral on the debtor's premises under section 9504."
UCC 9–504 reads, in pertinent part, as follows:
"Sec. 9–504. (1) . . . A secured party after default may sell, lease or otherwise dispose of any or all of the collateral in its then condition or following any commercially reasonable preparation or processing. . . .
(2) . . . If the security interest secures an indebtedness, the secured party must account to the debtor for any surplus, and, unless otherwise agreed, the debtor is liable for any deficiency. . . .
(3) . . . Disposition of the collateral may be by public or private proceedings and may be made by way of one or more contracts. . . . Unless collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, reasonable notification of the time after which any private sale or other intended disposition is to be

made shall be sent by the secured party to the debtor. . . .
(4) Rights acquired by purchaser. When collateral is disposed of by a secured party after default, the disposition transfers to a purchaser for value all of the debtor's rights therein, discharges the security interest under which it is made and any security interest or lien subordinate thereto. The purchaser takes free of all such rights and interests even though the secured party fails to comply with the requirements of this part or of any judicial proceedings.
(a) in the case of a public sale, if the purchaser has no knowledge of any defects in the sale and if he does not buy in collusion with the secured party, other bidders or the person conducting the sale; or
(b) in any other case, if the purchaser acts in good faith.

2. The Fourteenth Amendment, Sec. 1, provides in part: "No State shall . . . deprive any person of life, liberty, or property, without due process of law. . . . "

3. 42 U.S.C. Sec. 1983 provides:
"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

ration pursuant to 28 U.S.C. Secs. 2201 and 2202 that UCC 9–503 and 9–504 are unconstitutional. They also seek injunctive relief, inter alia, restraining the named defendants from repossessing automobiles on which they hold security agreements without prior notice and opportunity for judicial hearing. Jurisdiction is properly alleged under 28 U.S.C. Secs. 1343(3) and (4).[4]

The parties have filed extensive stipulations of fact. The plaintiffs seek to maintain the suit as a class action, and have moved for summary judgment. Each defendant has filed a motion to dismiss on the grounds that the court lacks jurisdiction and that this case is not a proper class action. Insofar as the motions to dismiss allege that there is insufficient state action to bring the plaintiffs' claims within the Fourteenth Amendment and 42 U.S.C. Sec. 1983, it is proper to treat them as being motions to dismiss for failure to state a claim on which relief can be granted. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946). Since the defendants allege in their Memorandum of Law in Support of Motion to Dismiss that the plaintiffs have not been denied due process of law, and the Memorandum has been incorporated into the motions by reference, the court will treat the defendants' motions as for summary judgment under Rule 56. The court finds no material issues of fact to be resolved by further hearings. The foregoing Opinion and Order is based on the pleadings, stipulations, affidavits and exhibits on file.

## I.

The facts in the cases of the named plaintiffs are relatively simple. The plaintiffs Edward and Shirley Ann Watson are joint owners of a 1966 Buick, subject to a security interest held by defendant Branch County Bank. The plaintiffs purchased the vehicle for about $700, made a substantial down payment, and borrowed $484.64 from the Branch County Bank. The security agreement between the Watsons and the Bank provided: "In the event Buyer defaults in the payment of any amounts due hereunder, or in the performance of any other obligations hereunder, or if a proceeding in bankruptcy, receivership or insolvency is instituted by or against Buyer, then Seller may declare the full amount hereunder immediately due and payable without notice or demand, and shall have all of the remedies of a secured party under the Michigan Uniform Commercial Code and any other applicable laws." On August 3, 1972, plaintiffs' vehicle was peacefully repossessed from the driveway, in accordance with M.C.L.A. Sec. 440.9503. The plaintiffs did not receive notice of a judicial hearing before repossession, but they did receive notice of repossession and notice of the proposed sale. At the time of repossession, the plaintiffs still owed $170.88 to the Bank. It appears from the affidavit filed by the plaintiffs that they have a child which has a chronic bronchial condition which requires visits to the doctor's office for care. The plaintiffs' residence is approximately ten blocks from the nearest bus line and during the time that the plaintiffs were without their automobile, Mrs. Watson had to use a taxi cab or make requests of friends for transportation in order to get the child to the doctor.

The plaintiffs Barbara and James Grabbert are joint owners of a 1969 Chevrolet that was subject to a security interest held by defendant Michigan National Bank. The security agreement

---

4. 28 U.S.C. Sec. 1343 provides, in part:

"The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:

"(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;

"(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote."

between Barbara and James Grabbert and the Bank required the former to maintain insurance on their vehicle. The agreement also provided that upon default the Bank could "exercise from time to time any rights and remedies, including the right to immediate possession of the goods, available to it under applicable law." The agreement further provided, "All rights and obligations of the parties hereto concerning the retaking, retention, redemption, and resale of the goods and the disposition of the proceeds thereof, shall be governed by the applicable provisions of the Uniform Commercial Code as adopted in the State of Michigan." Before repossession of the Grabberts' automobile, the Allstate Insurance Company, with whom the Grabberts had insurance, informed Michigan National Bank that the insurance on the Grabbert vehicle had been cancelled. It appears from the affidavits and exhibits that the Grabberts' policy had been cancelled by Allstate in error. Nonetheless, on June 23, 1972, Michigan National Bank repossessed the Grabbert vehicle from the employees' parking lot at Mr. Grabbert's place of work, the Lakeview General Hospital. The Battle Creek Township police phoned Mr. Grabbert at work to inform him that his car had been repossessed and that he should not report it stolen. The vehicle was peacefully repossessed in accordance with M.C.L.A. Sec. 440.-9503, and the plaintiffs did not have a judicial hearing at any time prior to repossession. Although the Bank was informed of Allstate's error, it required the Grabberts to pay the entire outstanding balance on their loan, approximately $800.00, as a condition of the return of the car. To do this, the Grabberts had to secure a new loan from a small loan company at a substantially higher rate of interest than they had been charged on the original loan with Michigan National.[5]

Plaintiff Johnny Gatson purchased a 1971 Buick from Esmer French, d/b/a French's Auto Sales, on or about December 20, 1971. He signed an automobile purchase money security agreement establishing a security interest in the automobile in favor of French. French assigned the contract and security interest to the defendant Security National Bank of Battle Creek. The security agreement provided in part: "Upon . . . default and at any time thereafter Seller may declare all obligations secured hereby immediately due and payable and shall have the remedies of a Seller under the Uniform Commercial Code." Subsequent to the making of the contract, the Bank received only two regular monthly payments of $125.57 each on March 7 and May 19, 1972. On July 7, 1972, two agents of the Bank observed the Gatson vehicle parked on Michigan Avenue in the City of Battle Creek during normal business hours. After determining that it was the Gatson vehicle, the agents of the Bank placed an order for a wrecker to come to the scene to remove the vehicle to premises controlled by the Bank. While the Bank's agents were waiting for a wrecker, a police car operated by an officer of the Battle Creek Police Department drove by. One of the Bank's agents flagged the car down, and told the officer that they were repossessing the Gatson vehicle. The officer got out of his car and remained on the scene, standing on the sidewalk a few feet from the Gatson vehicle. The Gatson car had been driven to the place where identified by the Bank's agents by Frieda Miller (now Frieda Gatson) with the

5. There is no outstanding security agreement between the Grabberts and the Michigan National Bank, so there is no foundation for injunctive relief against the Bank. The Grabberts' original complaint contained a claim for damages under 42 U.S.C. Sec. 1983 as well as a request for declaratory relief. The damage claim was subsequently dropped with leave of the court. The court originally had jurisdiction under 28 U.S.C. Sec. 1343. The court can hear the Grabberts' claim for declaratory relief as to UCC 9-503, but not 9-504, even though further relief is not sought, 28 U.S.C. Sec. 2201; F.R.Civ.P. 57. As set forth more fully below, there is no class of plaintiffs as to Michigan National Bank; the Grabberts are suing for themselves only.

consent of plaintiff Gatson. Subsequent to the arrival of the officer on the scene, she returned to the car and was advised by the agents of the Bank that they were taking possession of the car by reason of Gatson's claimed default in payments. At first Ms. Miller refused to give up the keys, but she did so after being informed that the wrecker had been called. It is stipulated that the police took no part in the physical repossession except as might be inferred from the physical presence of the officer at the scene. The agents of the Bank did not tell Ms. Miller that the police could intervene if she did not give them the keys. It is also stipulated that the vehicle was peacefully repossessed without a breach of the peace, and that the Bank did not seek judicial authorization for the removal of the vehicle from the actual or constructive possession of the plaintiff Gatson. After the Gatson vehicle was driven away by the Bank's agents, it was driven to a fenced and locked parking lot owned and maintained by the Bank (where the vehicle has been ever since).

The statutes upon which the defendants rely are a part of Michigan's comprehensive regulation of the financing of automobile purchases. The Michigan scheme presupposes that nearly all buyers of automobiles are unable to fully protect themselves because of a lack of intelligence, attention, knowledge, assertiveness, or bargaining power. The scheme likewise presupposes that a significant number of sellers will take unfair advantage of the situation unless they are subject to regulation. Michigan statutes carefully structure automobile sales financing, prohibiting some practices, requiring others, and deliberately leaving some aspects of the transactions open to the parties. The Motor Vehicle Sales Finance Act, M.C.L.A. Sec. 492.101 et seq., provides for the licensing of those in the business of financing automobile sales. The form and mode of execution, and some of the contents of financing contracts are controlled by statute, M.C.L.A. Sec. 492.112 et seq.

Financers are expressly forbidden to include in their contracts certain terms relating to accelerated default, repossession, and waiver of buyer rights of action, among others. M.C.L.A. Sec. 492.-114.

The automobile certificate of title requirements, administered by the Michigan Department of State, are part of the regulatory plan. The purchase and sale of an automobile and the creation of a security interest therein must be reported to the Department of State. Proper reporting of the existence of a security interest in an automobile is necessary for perfection. Upon receipt of an application for a certificate of title, the Department is required to "determine the genuineness, regularity, and legality" of the application, M.C.L.A. Sec. 257.209. The Department is empowered to conduct investigations, M.C.L.A. Sec. 257.209, and is required to refuse to issue a certificate of title when it has "reasonable ground to believe that . . . the issuance of a certificate of title would constitute a fraud against the rightful owner or other person having a valid lien upon such vehicle . . .," M.C.L.A. Sec. 257.219(2). In most cases, the Department issues the new owner a certificate of title containing a statement of the security interest. M.C.L.A. Secs. 257.216, 257.217, 257.238, 257.222.

The UCC provisions on secured transactions are essential and complementary parts of the sales and financing regulations. Within certain broad limits, Michigan leaves most of the matters concerning default and foreclosure to the parties. Neither the UCC nor 'the Motor Vehicle Sales Act defines default. Once the secured party believes, correctly or not, that a default has taken place, he may take immediate possession of the automobile "unless otherwise agreed" by the parties. UCC 9–503.

Functionally, both power and process are in the hands of creditors. In the context of consumer automobile sales financing, the words "unless otherwise agreed" in UCC 9–503 are superfluous.

As the regulatory scheme presumes, sellers and financers have superior expertise and bargaining power, so they are effectively free to demand and get purchaser adherence to "self-help repossession" as a seller's remedy for default. All the financing contracts involved in this case are printed, and all contain such contractual provisions.

The burden is entirely upon the debtor to challenge the seizure of his automobile by the secured party. If the secured party refuses to relent, then the debtor must go to court. However, the financial condition of most consumer debtors, the value of the automobile, and the high cost of legal services in most cases preclude such a course of action. The practical result of the present scheme is to leave most debtors without effective means of redress for wrongful seizures of automobiles.

After the seizure of the automobile for alleged default, the financer may sell it in a commercially reasonable manner, UCC 9–504. The purchaser at the foreclosure sale takes the debtor's interest and takes free of the financer's security interest and all subordinate liens or security interests.

It is crucial to the repossession-sale scheme that the Secretary of State must, on request and on the submission of appropriate documents and fees, issue a new certificate of title. M.C.L.A. Sec. 257.236a(a) and (d). This is done on ex parte affidavit that the debtor's interest in the automobile was "lawfully terminated." Moreover, if the outstanding certificate of title is not delivered to the Secretary of State, that officer has the affirmative duty of making a "demand therefor from the holder thereof." Without the help and cooperation of the Secretary of State, the whole repossession-sale scheme would collapse, since good title could not be transferred without it.

## II.

The plaintiffs have moved the court for an order declaring that this case is properly maintainable as a class action. They propose that the class of plaintiffs be composed of the named plaintiffs and all others whose automobiles are subject to repossession by one of the named defendants without prior notice and opportunity for judicial hearing, as authorized by M.C.L.A. Secs. 440.9503 and 440.9504, M.S.A. Secs. 19.9503 and 19.-9504. The defendants contend that this suit is not properly maintainable as a class action.

### A.

For a case to be properly maintainable as a class action, all the requirements of F.R.Civ.P. 23(a) and the requirements of one of the subsections of Rule 23(b) must be met. The plaintiffs allege that all the requirements of Rule 23(a) are met in this case, and that the requirements of Rule 23(b)(2) are also met. The defendants deny that this case is appropriately maintainable as a class action under Rule 23. Each of the requirements of Rule 23, and its application to this case, is discussed below.

█ █ It is, of course, well settled that "to have standing to sue as a class representative it is essential that a plaintiff must be a part of that class, that is, he must possess the same interest and suffer the same injury shared by all members of the class he represents." Schlesinger v. Reservists Committee to Stop the War, —— U.S. ——, 94 S.Ct. 2925, 2930, 41 L.Ed.2d 706 (1974). At the date this suit was commenced, the plaintiffs Barbara and James Grabbert had no unpaid loan or outstanding security agreement with the defendant Michigan National Bank, and their automobile was not subject to seizure and sale by the Bank. Although they may sue for themselves, they cannot represent such a class as they request, or any other readily definable and manageable class that occurs to the court. The plaintiffs Edward and Shirley Watson and Johnny Gatson, in contrast, did have unpaid loans and outstanding security agreements at the date they filed their complaints, so they may represent a class, providing the other requirements

are met. Accordingly, the rest of this Part II of this Order applies only to the Watsons and Gatson and their requests that their cases be maintained as class actions.

Rule 23(a)(1) provides that the class must be so numerous that joinder of all the members is impractical. The defendants have stipulated that there are a substantial number, amounting in specified cases to several thousands, of loans outstanding which are secured by automobiles. It would clearly be impractical to join all these debtors as parties to this lawsuit.

■ ■ Rule 23(a)(2) provides that there must be questions of law or fact common to the class. In this case, the questions of law common to the class concern the issue of whether the repossession of automobiles without previous notice and opportunity to be heard as authorized by M.C.L.A. Secs. 440.9503 and 440.9504 deprives the members of the plaintiffs' class of their property without due process of law in violation of the Fourteenth Amendment of the United States Constitution and its implementing statutes. The rule does not require that *all* questions of law or fact be common to the class, Like v. Carter, 448 F.2d 798, 802 (8th Cir. 1971), cert. den. 405 U.S. 1045, 92 S.Ct. 1309, 31 L. Ed.2d 588 (1972), so the fact that there are some factual matters which may be peculiar to the named plaintiffs does not mean that this requirement is not met.

Similarly, the named plaintiffs' claims are "typical" of those of the class, as required by Rule 23(a)(3).

■ Rule 23(a)(4) requires that the named plaintiffs must fairly and adequately protect the interests of the class. There can be no doubt that the plaintffs' attorneys supported by the considerable legal resources of the Michigan Legal Services Assistance Program, are expert and fully qualified to render fair and more than adequate legal representation to the members of the plaintiffs' class.

The defendants have objected that the plaintiffs do not adequately represent the "interests" of all the members of the plaintiffs' class as required by Rule 23(a)(4). Defendants have asserted that if M.C.L.A. Secs. 440.9503 and 440.9504 were declared unconstitutional, then the cost of credit would be increased to all members of the plaintiffs' class and some members would not be able to secure any credit. This, it is contended, would be contrary to the "interests" of the plaintiffs' class, and especially contrary to the interests of those who could no longer obtain credit.

■ The defendants' analysis misapprehends the basic purpose of Rule 23(a)(4), and the types of interest to which it refers. Apart from the question of the quality of counsel, the rule directs the court to take particular care that absent plaintiffs' legally protectable interests are not unfairly lost or compromised through the class action. This possibility is usually present in class action suits concerning pre-existing funds, or suits in which a large number of people have common or similar grounds for the assertion of damage claims against a well-heeled defendant. In these and similar situations, the court must guard against collusion, see, e.g., Hansberry v. Lee, 311 U.S. 411, 61 S.Ct. 115, 85 L. Ed. 22 (1940), or improper actions by putative representatives which prejudice the claims of absent plaintiffs. In this case, however, there is no such danger of collusion, and no such cumulative and implicitly conflicting pecuniary claims. On the contrary, if M.C.L.A. Secs. 440.-9503 and 440.9504 are unconstitutional, neither the named plaintiffs, nor others similarly situated, nor the defendants have any legally protectable interest in maintaining it, or at least such interest that would render this suit inappropriate as a class action.[6] Moreover, the

---

6. This is not to say that the possible effect of a declaration that the self-help repossession statutes are unconstitutional is irrelevant to this suit. Assuming the Fourteenth Amendment applies, whether persons have been deprived of due process of law depends

amount of increase in cost and reduction in the availability of credit which would follow a declaration that the statutes in question are unconstitutional are highly speculative and thus cannot be said to represent the identifiable concrete legal interest contemplated by Rule 23(a)(4). The fact that people may differ over the policy implications of a constitutional suit does not render such a suit inappropriate for a class action. Snyder v. Board of Trustees, 286 F.Supp. 927, 931 (N.D.Ill.1968).

■ The requisites of Rule 23(a) having been met, the court must next inquire whether the requirements of one of the subsections of Rule 23(b) are met. The court finds that the parties opposing the class have acted or refused to act on grounds generally applicable to the class, so that declaratory and injunctive relief may be appropriate for the class as a whole. F.R.Civ.P. 23(b)(2). The defendants have certainly acted or refused to act on grounds "generally applicable" to the class. The defendants assert the right under the authority of Michigan statutes to repossess automobiles in the possession of the members of the plaintiffs' class without previous notice and opportunity for hearing. In addition, the plaintiffs have requested declaratory and corresponding final injunctive relief. The present case is a good example of the civil rights action for which Rule 23(b)(2) was intended. Thomas v. Clarke, 54 F.R.D. 245, 251–252 (N.D.Ill.1971).

In sum, the court finds that all the requirements of Rule 23(a) are met, that the requirements of Rule 23(b)(2) are also met, and that therefore this case is properly maintainable as a class action. Barnes v. Board of Trustees, 369 F.Supp. 1327, 1332–1333, (W.D.Mich.1973).

### B.

There is a question as to whether it is necessary to give some form of notice to the absent members of the plaintiffs' class before proceeding with this case. Courts have split where they have given full consideration to the issue of notice in 23(b)(2) class action suits. See, generally, Miller, "Problems of Giving Notice in Class Actions," 58 F.R.D. 313–317 (1973), and cases cited Id. at 313 nn. 2 and 3. See also 7A Wright and Miller, Federal Practice and Procedure § 1786 at 142–144; 3B Moore's Federal Phactice Par. 23.72(2) (1974, Supp.1973).

The Supreme Court recently considered the question of notice to the members of a class in a 23(b)(3) action. Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Although the decision did not specifically apply to 23(b)(2) class actions, the Court established an analytical framework within which to consider the issue of notice to a 23(b)(2) class.

■ Rule 23 was extensively revised in 1966. At that time, many basic constitutional principles concerning the due process requirements of notice and opportunity to be heard in the course of a suit had already been developed. See, e.g., Mullane v. Central Hanover Bank and Trust Co., 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950); Schroeder v. City of New York, 371 U.S. 208, 83 S.Ct. 279, 9 L.Ed.2d 255 (1962). These principles were carefully considered by the drafters, and Rule 23 was drawn with due process requirements in mind. Proposed Rules of Civil Procedure, Rule 23, Advisory Committee's Note, 39 FRD 98, 107 (1966). Although it is axiomatic that a rule of civil procedure cannot take precedence over the Due Process Clause of the Fifth Amendment, the Supreme Court's approach in Eisen indicates that Rule 23 is presumptively valid as comprehending adequate due process protections. Rule 23 thus provides the starting point and the framework for deciding whether notice is required in the case presently before the court.

on all the circumstances. An analysis of all the circumstances necessarily requires an investigation of the economic and social implications of the present arrangements and the proposed court action.

Rule 1 declares that the basic objective of the Federal Rules of Civil Procedure is "to secure the just, speedy, and inexpensive determination of every action." Rule 23, and specifically Rule 23(b)(2), is in accord with this general philosophy. Class actions are a relatively inexpensive, expeditious, and socially desirable way for a few named plaintiffs, usually represented by highly professional public interest attorneys, to raise substantial questions concerning the constitutional or statutory rights of a large number of people and to secure comprehensive and just remedies where rights are shown to be violated.

The reasons why constitutional class actions have become so important in recent years are not hard to find. In the area of constitutional adjudication, the federal courts have become, as the somewhat belated result of the new structure of law which emerged in the post-Civil War era, the guardian and guarantor of fundamental individual rights against public and private abuses of power. Mitchum v. Foster, 407 U.S. 225, 238–239, 92 S.Ct. 2151, 32 L.Ed.2d 705 (1972). However, since the Civil War, the population of our great nation has grown to over 200,000,000 people. Our economic, social, political, and governmental system has become extremely complex, and has created challenges to our individual rights and liberties scarcely dreamed of a century ago. The class action was readily adapted to give the courts a modern procedural tool to meet these novel challenges.

A class action raising a constitutional issue is a "We, the People" action, and therefore should be of first and vital concern to the federal judiciary. Essentially, a "We, the People" action is a means by which groups of people who believe they are suffering similar deprivations of their rights and liberties can easily gain access to federal courts and can receive more rapid disposition of their claims. The whole point of having a constitution in a democratic society is "to establish justice and to secure domestic tranquility," U. S.Const., Preamble, and indeed if we do not establish justice through law we shall have no domestic tranquility. If people do not have ready access to the courts for the adjudication and redress of their grievances, then their frustrations increase, and both public and private social life tends to become infected, with senseless mass violence the likely and all too frequent result. By helping to provide ready access to federal courts for substantial numbers of people, the class action tends to alleviate the pressures on the social order.

In many class actions, the most important aspect of the suit is the number of people and situations which are reached by the remedial power of the court. The substantive questions could nearly always be raised by one or a few named plaintiffs. However, a declaratory judgment binds only the named parties, and defendants may in some cases find petty distinctions in order to resist applying the terms of the judgment to non-parties to the original action. In such cases, aggrieved persons must bring additional suits or continue to suffer infringement of their basic rights. A comprehensive 23(b)(2) plaintiffs' class applies a judgment automatically to those whose rights have been violated, and normally avoids the necessity for a multiplicity of suits.

The class action efficiently focuses attention on the basic constitutional or statutory questions which are common to the class and are the nub of the problem. While courts are naturally sensitive to vital constitutional and statutory distinctions, in class actions they necessarily de-emphasize those petty factual differences which exist among the cases of individual plaintiffs. The broad questions of social policy and individual rights and liberties are brought to the forefront, where they ought to be.

The court is aware of some current dissatisfaction with the number and importance of successful constitutional class action suits in recent years. It is indisputable that many of these cases are complicated and put strains on the

resources of the courts. However, recent events and the large number of successful suits strongly confirm the judgment of the drafters of Rule 23 that 23(b)(2) class actions are desirable and even necessary as a matter of enlightened public policy. The only apparent error of the drafters was their assumption as to the extent of the problem. For the reasons stated above, this court earnestly submits that the ostrich-like response of closing our eyes and the courthouse doors has little to recommend it and can substantially contribute to disruption of domestic tranquility.

Although Rule 23(c)(2) specifically requires the court to give the best notice practicable to absent members of a 23(b)(3) class, the Rule imposes no such mandatory notice requirements in 23(b)(2) actions. Rather, Rule 23(d)(2) operates to make notice discretionary with the court in 23(b)(2) actions, and a number of factors are set forth which are a guide to the court.[7] There are good reasons for the distinction between 23(b)(2) and 23(b)(3) class actions in the matter of notice. 23(b)(3) actions involve common damage claims or other property interests. A decision on the merits binds all members of the class. Where there is a fixed fund or property, or where a defendant may not be able to pay a large judgment, the interests of the individual members of the class may partially conflict with one another. Since it is unfair to adjudicate an individual's right to property or claim for damages in his absence, notice is essential. In such cases, the individual is specifically given the right to be excluded from the class, Rule 23(c)(2)(A). This right to be excluded from the class was emphasized by the Supreme Court when it held that notice to individual members of a 23(b)(3) class was required. Eisen, supra, 417 U.S. at 173, 94 S.Ct. 2140, 40 L. Ed.2d 732.

In contrast, actions under 23(b)(2) involve broad questions of constitutional or statutory law and public policy. In the present case, as in most 23(b)(2) actions, absent class members have no substantive property interest or legal claims upon the defendants which can be adversely affected by the suit. With the possible exception of some policy disagreements, the plaintiffs' class is unified and cohesive. To the extent that absent class members might, as a matter of policy, disfavor the position taken by the named plaintiffs in this case, the defendants are more than adequate stand-ins for the purpose of presenting the policy arguments to the court. As noted above, policy positions are not legal interests. Thus, the fact that some members of the class might object to the position of the named plaintiffs will not prevent the suit from being maintained as a class action. More importantly, absent members of the 23(b)(2) class are not specifically given a right to withdraw from the suit, and no such right has been recognized by the courts. See 7A Wright and Miller, Federal Practice and Procedure 144. In the absence of special circumstances, notice to the members of a 23(b)(2) class serves little or no useful purpose in the context of the action.

---

7. Rule 23(d) provides, in part:
 "(d) Orders in Conduct of Actions. In the conduct of actions to which this rule applies, the court may make appropriate orders: . . . ; (2) requiring, for the protection of the numbers of the class or otherwise for the fair conduct of the action, that notice be given in such manner as the court may direct to some or all of the members of any step in the action, or of the proposed extent of the judgment, or of the opportunity of members to signify whether they consider the representation fair and adequate, to intervene and present claims or defenses, or otherwise to come into the action; . . . ."
 Although the Rule is written in terms of a grant of power to the court, it is doubtful that any such explicit grant is necessary, especially where notice is constitutionally required. Rather, the thrust of the Rule is that the court has a broad discretion in the matter of notice and the Rule states the factors which will ordinarily inform the exercise of this discretion.
 Rule 23(d)(2), and its application to the present case, is discussed more fully, infra..

On the other hand, a requirement of giving notice to absent class members would impose substantial burdens on the parties and necessarily involve procedural complications. Where notice is required to be given, the court must determine the precise purpose, content, and form of the notice, and establish appropriate time periods. More important, the plaintiffs must ordinarily bear the cost of notice. Eisen, supra. As a practical matter, the named plaintiffs in class actions raising broad constitutional or statutory questions simply cannot afford to pay for notice to absent class members, and a requirement that notice be given effectively prevents the suit from being maintained as a class action.

Furthermore, apart from the interests of the parties, the giving of notice may ultimately have a substantial impact upon the court. Where named plaintiffs give actual notice, the absent class members usually must direct their replies to the clerk of the court. In the present case, which concerns the terms and enforcement of security interests in automobiles, no matter how the notices were worded, large numbers of people would call the court for information concerning the suit and their obligations respecting it. Much time would be spent answering these inquiries. Where a particular case required such a commitment of court resources to prevent serious prejudice or to advance a suit toward decision, the court would not hesitate to make an appropriate order. However, before ordering actual notice, the court ought to be able to inquire whether it is necessary under the circumstances.

The drafters of Rule 23 took most or all of these factors into account when they established the notice requirements for 23(b)(2) class actions. Considering the marginal benefits to be derived from notice, and the high cost to the parties and the court, they decided that notice to absent class members need not be given in 23(b)(2) class actions in the absence of special circumstances.

It is probably impossible to draw an exhaustive list of those special circumstances which would indicate that notice ought to be given, but some examples may be suggested. One such circumstance might be the presence of a damage claim in connection with a suit under 42 U.S.C. Sec. 1983.[8] Another might be the presence of a defendant class.

Where a plaintiff class seeks a declaratory judgment and injunctive relief, Rule 23(d)(2) sets forth the basic factors which the court ought to consider in determining whether notice is required.[9] The Rule indicates that the major purposes for notice in a 23(b)(2) action are the protection of members of the class and the fair conduct of the suit. These are plainly derived from the Due Process Clause. Notice may be given of any step in the action, or of the extent of the proposed judgment, but such notice need not be given to all members of the class. At the inception of the suit, the court might require notice in order to give members of the class the opportunity to signify whether representation by the named plaintiffs is fair and adequate.[10] Notice might invite members of the class to intervene to present claims or defenses, or otherwise come into the action to provide, for example, a broader representation of named plaintiffs, or to submit views as amici curiae.

In the case presently before the court, is there any special circumstance which would require notice to the members of

---

8. A court might treat such a suit as a 23(b)(3) class action, despite the presence of broad constitutional or statutory questions.

9. Rule 23(d)(2) is quoted supra, n. 7.

10. In Eisen, supra, the Supreme Court rejected the view set forth in the early case of Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940), that adequate representation is the touchstone of due process in a class action. 417 U.S. at 172–178, 94 S.Ct. 2140, 40 L.Ed.2d 732. Rejection of the narrow view of Hansberry was implicit in Mullane, supra, decided in 1950.

the plaintiffs' class? The court has already found that the named plaintiffs and their attorneys adequately represent the class. Considering the experience and expertise of the plaintiffs' attorney, any objection to the adequacy of his representation would be frivolous at best.

■ There is no compelling reason why the court ought to invite absent class members to intervene. Certainly individual class members have no absolute right to intervene in a class action. The very existence of Rule 23 negatives the idea that absent members of a 23(b)(2) class are indispensible under Rule 19(b). In the circumstances of this case and probably most or all other 23(b)(2) actions, no absent class member is even "necessary" under Rule 19(a). Individual class members are thus merely "permissive" parties, and the court may in its discretion refuse to allow them to intervene personally.

■ The court can see no useful purpose to be served by inviting absent members of the plaintiffs' class in this case to intervene to present additional claims or to intervene for other reasons. The nature of the complaint and relief sought are such that, apart from the constitutional issue raised, no individual claim for damages or specific performance against any of the defendants will be affected by this suit. The presentation of additional individual claims would complicate the suit and protract it to the detriment of the class as a whole. The named plaintiffs are typical of the class, and no additional plaintiffs are necessary. The issues involved in the suit have been fully canvassed in the cases and literature, and additional supplementation by persons with amicus curiae status is not needed.

Thus, the court finds no special circumstances in this case which require the giving of notice to absent members of the plaintiffs' class.

■ Finally, reviewing Rule 23 and its application to the present case, the court finds that the provisions made by Rule 23(d)(2) for discretionary notice in 23(b)(2) class actions are consonant with the requirements of the Due Process Clause of the Fifth Amendment. In the leading case of Mullane, supra, the Supreme Court stated that notice and opportunity for hearing had to be "appropriate to the nature of the case." 339 U.S. at 313, 70 S.Ct. at 657. With regard specifically to the notice requirement, the Court cautioned that "due regard" was to be paid to "the practicalities and peculiarities of the case." Id. at 314, 70 S.Ct. at 657. The Court then restricted notice requirements in the case before it "in view of the character of the proceedings and the nature of the interest . . . involved . . . ." Id. at 317, 70 S.Ct. at 659. In this plaintiffs' class action raising serious constitutional questions and seeking only declaratory and injunctive relief, the absent class members have a de minimis interest in receiving actual notice of the suit, but they have a substantial interest in seeing the case proceed to judgment as a class action. In view of the character of the proceedings and the nature of the interests involved, Rule 23 sets forth constitutionally permissible standards concerning notice to the absent members of the class.[11]

C.

The court concludes that the cases of Watson against Branch County Bank and Gatson against Security National Bank are properly maintainable as class

---

11. In Zielstra v. Tarr, 466 F.2d 111 (6th Cir. 1970), the Court of Appeals for the Sixth Circuit stated that due process required that notice be given in all class actions. However, the statement was clearly dictum, since the Court of Appeals held that the District Court did not have subject matter jurisdiction of the case which was on appeal. Moreover, Zielstra and related Selective Service cases had implications for national security which may have influenced the Court to take such a broad position. In any event, Eisen, supra, seems to require that the matter be re-examined.

actions. The plaintiffs' class in these cases is finally defined as the named plaintiffs and other natural persons [12] similarly situated whose automobiles are subject to repossession and final disposition by the respective named defendants under color of M.C.L.A. Secs. 440.9503 and 440.9504 without resort to judicial process.

### III.

The primary issue in this case is whether any legal process is due the plaintiffs from the state, whether, that is, the plaintiffs are entitled under the circumstances to any legal process at all in conjunction with the repossession of their automobiles, and if so, in what form and at what time.

The Due Process Clause of the Fourteenth Amendment guarantees several fundamental rights. Three specifically mentioned substantive rights are life, liberty, and property. Necessarily associated with these rights, and implicit in the Clause considered as a whole, is a right to the pursuit of happiness.[13] See Decl. of Ind. Also fundamental is a right to legal process, a right ultimately necessary to secure the great substantive rights.

### A.

There is no doubt that the "repossession" of an automobile ·by a secured party deprives a person of a "property interest" within the meaning of the Due Process Clause. Board of Regents v. Roth, 408 U.S. 564, 576–577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); Mitchell v. W. T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). At the very least, "repossession" in accordance with UCC 9–503 deprives a person of the possession and use of his automobile, cf., Sniadach v. Family Finance Corp., 395 U.S. 337, 339, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969);

Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and the sale of the automobile in accordance with UCC 9–504 would deprive the owner of title.

### B.

The constitutional obligation of government to provide regular judicial process for the settlement of private disputes is of ancient lineage. The Magna Carta, cap. 39, provided, "No free man shall be taken or imprisoned or disseised or outlawed or exiled or in any way ruined, nor will we go or send against him, except by the lawful judgment of his peers, or by the law of the land." This provision did not apply only to actions of the King for purposes of state, but extended to private disputes as well. J. Holt, Magna Carta 227–228 (1965).

More important, cap. 40 of the Magna Carta provided, "To no one will we sell, to no one will we deny, or delay right or justice." This provision required that legal process be afforded and was intended to set a standard for the regular and impartial administration of royal justice in private as well as public actions. Private litigants were further aided by the requirements that the common pleas be held in a fixed place, which came to be Westminister, and that certain land cases be regularly held in the counties in which they arose. Caps. 17, 18, 19.

Although the Magna Carta was not immediately and fully implemented, many came to assume that the document embodied immutable principles of just, limited, constitutional government. Blackstone, who wrote on the eve of the American Revolution, recognized the necessity of providing legal process to resolve disputes. He stated that there were three absolute rights of Englishmen, the rights of life, liberty, and property. He further noted that these sub-

---

12. The plaintiffs' class is limited to natural persons; corporations are not included.

13. "[T]his ultimate end of man is called the human good, and it is happiness.

". . . . .
"[T]he ultimate end of man is happiness." St. Thomas Aquinas, in The Pocket Aquinas: Selections from the Writings of St. Thomas 190, 255 (V. Bourke, ed. 1960).

stantive rights would have been declared in vain unless the constitution had provided a method to secure then actual enjoyment. This method was the establishment of "certain other auxiliary subordinate rights of the subject, . . . [to] serve principally as outworks or barriers, to protect and maintain inviolate the three great and primary rights. . . ." 1 Commentaries on the Laws of England 129, 140–141 (Christian ed., 1822).

One of the protective "outworks or barriers" mentioned by Blackstone was legal process:[14]

"A third subordinate right of every Englishman is that of applying to the courts for the redress of injuries. *Since the law is in England the Supreme arbiter of every man's life, liberty, and property, courts of justice must at all times be open to the subject, and the law be duly administered therein.* The emphatical words of *magna carta*, spoke in the person of the king, who in judgment of law (says Sir Edward Coke*) is ever present and repeating them in all his courts, are these: *nulli vendemus, nulli negabimus, aut differemus rectum vel justiciam* [to no one will we sell, to no one will we deny, or delay right or justice]: 'and therefore every subject,' continues the same learned author [Coke], 'for every injury done to him *in bonis, in terris, vel persona* [in goods, in lands, or person], by any other subject, be he ecclesiastical or temporal, without any exception, may take his remedy by the course of the law, and have justice and right for the injury done to him, freely without sale, fully without any denial, and speedily without delay.' " (Emphasis supplied.)

* 2 Inst. 55.

The generation of patriotic Americans which made the Revolution and wrote the Constitution and Bill or Rights read Coke and Blackstone thoroughly, and developed their own appreciation for due process of law. Among the stated causes of the Revolution were King George's obstruction of the administration of justice by refusing his assent to laws for establishing judiciary powers, and the subjection of the colonial judges to his own will. Dec. of Ind.. As if in counterpoint to the abuses of a royal sovereign, within a decade of the Revolution Daniel Shays and bands of economically strapped farmers forcibly closed Massachusetts courts to prevent the foreclosure of mortgages.

The Constitution provided for a separate, independent judiciary, and endowed the federal government with adequate powers. to meet domestic emergencies. The First Congress established federal courts with appropriate jurisdiction. The Fifth Amendment carried forward the tradition of Magna Carta.

In Marbury v. Madison [5 U.S. (1 Cr.) 137, 2 L.Ed. 60], decided by the Supreme Court in 1803, the question was whether the Court ought to issue a mandamus to the Secretary of State requiring him to deliver the plaintiff's commission as a justice of the peace to the District of Columbia. After determining that Marbury had a right to his office and commission, the Court went on to determine that the law gave him a legal remedy to redress the wrongful withholding of the commission. Chief Justice John Marshall stated:

"The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection. In Great Britain, the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court.

"In the 3d vol. of his Commentaries (p. 23) Blackstone states two cases in which a remedy is afforded by mere operation of law. 'In all other cases,' he says, *'it is a general and indisputable rule, that where there is a legal*

14. 1 Commentaries, supra, at 141.

right, there is also a legal remedy by suit, or action at law, whenever that right is invaded.' And afterwards (p. 109, of the same vol.), he says, 'I am next to consider such injuries as are cognizable by the courts of the common law. And herein I shall, for the present, only remark, that all possible injuries whatsoever, that did not fall within the exclusive cognisance of either the ecclesiastical, military or maritime tribunals, are, for that very reason, within the cognisance of the common law courts of justice; *for it is a settled and invariable principle in the laws of England, that every right, when withheld, must have a remedy, and every injury its proper redress.'*

*"The government of the United States has been emphatically termed a government of laws, and not of ment. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."* 5 U.S. (1 Cr.) 137, 163, 2 L.Ed. 60 (1803). (Emphasis supplied.)

Although the original Constitution and Bill or Rights contained few limitations on state power, the Fourteenth Amendment and its implementing statutes wrought a "basic alteration in our federal system. . . . As a result of the new structure of law that emerged in the post-Civil War era . . ., the role of the Federal Government as a guarantor of basic federal rights against state power was clearly established." Mitchum v. Foster, 407 U.S. 225, 238, 92 S.Ct. 2151, 2160, 32 L.Ed.2d 705h (1972).

In enacting the Civil Rights Act of 1866 and its successor, the Civil Rights Act of 1871, the Congress was directly and immediately concerned with deprivations of private rights which were not being effectively prevented or redressed by Southern state governments. As Representative Perry stated in 1871,

"Sheriffs, having eyes to see, see not; *judges, having ears to hear, hear not;* witnesses conceal the truth or falsify it; grand and petit juries act as if they might be accomplices . . . . *[A]ll the apparatus and machinery of civil government, all the processes of justice, skulk away as if government and justice were crimes and feared detection.* Among the most dangerous things an injured party can do is to appeal to justice." Cong.Globe, 42d Cong., 1st Sess., App. 76, quoted in Mitchum, supra, 407 U.S. at 241, 92 S.Ct. 2151, 2161, 32 L.Ed.2d 705. (Emphasis supplied).

As the Equal Protection Clause guarded against invidious discrimination in law and practice, the Due Process Clause and the implementing congressional statutes sought to guarantee that process would be available for the just resolution of private disputes.

Throughout the nineteenth and first half of the twentieth century, the Supreme Court continued to give meaning to the phrase "due process of law." See cases cited in Boddie v. Connecticut, 401 U.S. 371, 377–378 and 377 n.3, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). Hovey v. Elliott involved a suit on an alleged private contract. After a court order that the defendant pay funds into the registry of the court was disobeyed, the defendant was found in contempt, his answer was stricken, and judgment on the contract was decreed for the plaintiffs. In finding this decree a violation of due process, the Court said, "the decree . . . awarded the property of the defendant to the complainants upon the hypothesis of fact that by contract the defendant had transferred the right in or to this property to the complainant. *If the court had power to do this by denying the right to be heard to the defendant, what plainer illustration could there be of taking property of one and giving it to another without hearing or without process of law?"* 167 U.S. 409, 418–419, 17 S.Ct. 841, 845, 42 L.Ed. 215 (1897). (Emphasis supplied.)

In Brinkerhoff-Faris Trust & Savings Co. v. Hill, Justice Brandeis, speaking for the Court, said, "Whether acting through its judiciary *or through its leg-*

*islature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it."* 281 U.S. 673, 682, 50 S.Ct. 451, 455, 74 L.Ed. 1107 (1930). (Emphasis supplied.) In other cases concerning administrative and prejudgment remedies, the Court generally upheld prejudgment seizures, providing that opportunity was given for ultimate judicial determination of liability, and that this opportunity was adequate. See cases cited and discussion in Mitchell, supra, 416 U.S. at 611–614, 94 S.Ct. 1895, 40 L.Ed.2d 406.

The modern Supreme Court has recognized due process of law as a separate right to be measured by federal constitutional standards. In Cohen v. Beneficial Industrial Loan Corp., for example, 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1528 (1949), one issue was the constitutionality under the Due Process Clause of a New Jersey statute making certain classes of plaintiffs in stockholder derivative suits liable for all expenses and attorneys' fees of the defense if they failed to make good their complaint. The plaintiffs argued that this provision violated both the procedural and substantive aspects of the Due Process Clause: procedurally, by unreasonably qualifying and in effect denying access to the courts for legal wrongs; and substantively, by imposing arbitrary impediments without reasonable relation to any existing abuses. 337 U.S. 541, 69 S.Ct. 1221, 93 L.Ed. 1532. The Court accepted the proposition that the Due Process Clause applied. It concluded that a "state may set the terms on which it will permit litigations in its courts," but indicated through its discussion that these terms must meet the minimum requirements of the Due Process Clause, 337 U.S. at 551–552, 69 S.Ct. 1221, 1228, 93 L.Ed. 1532.[15]

In more recent cases, the Supreme Court has been closely exploring the limits of the due process guarantee. A majority of the Court has rejected the view that a statutorily created property right can be conditioned on a statutory limitation of procedural due process protections. Rather, once the right exists, the procedures established for its impairment or deprivation must meet constitutional standards. Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (April 16, 1974).

Boddie v. Connecticut, supra, held that a State may not, consistent with the obligations imposed upon it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve the legal relationship of marriage without affording all citizens access to the means it has prescribed for doing so, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113. The Court added that it did "not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any individual. . . . ." Id. at 382, 91 S. Ct. at 788.

United States v. Kras, 409 U.S. 434, 93 S.Ct. 631, 34 L.Ed.2d 626 (1973), concerned the constitutionality of the requirement that a petitioner in bankruptcy pay a fifty dollar filing fee as a prerequisite to receiving a discharge. The Court noted that Congress is specifically granted constitutional authority to establish uniform laws on bankruptcies, and that the filing fee had a rational basis in the Congressional scheme. Discharge in bankruptcy was a legislatively created benefit, and the individual had no constitutional right to such a benefit. Finding that the petitioner's situation would not be altered in any constitutional sense if he did not receive a discharge, the Court held, in effect, that

---

15. The Court discussed both the substantive and procedural applications of the Due Process Clause. The holding was based on the proposition that "No type of litigation is more susceptible of regulation than that of a fiduciary nature," and the finding that the requirement of security was "reasonable." 337 U.S. at 552, 91 S.Ct. at 1228.

discharge in bankruptcy was not an interest cognizable by the Due Process Clause. Id. at 441–449, 93 S.Ct. 631, 34 L.Ed.2d 626.

Property interests, unlike discharges in bankruptcy, are specifically recognized in the Due Process Clause. The Supreme Court has in recent years considered procedural due process requirements in cases involving private disputes or contracts and property. See, e. g., Lindsey v. Normet, 405 U.S. 56, 92 S.Ct. 862, 31 L.Ed.2d 36 (1972); Sniadach, supra; D. H. Overmyer Co. v. Frick Co., 405 U.S. 174, 92 S.Ct. 775, 31 L.Ed.2d 124 (1972); Fuentes, supra; Mitchell, supra. Most of these cases are discussed more fully below.

■ The Anglo-American legal tradition and recent cases have firmly established that due process is not an "entitlement" similar to those in the area of property which the state may originally withhold altogether in its uncontrolled discretion. Rather, the state is constitutionally required to provide process of law in accordance with the mandates of the Fourteenth Amendment. This is emphatically the case to the extent that there is no independent federal remedy for what is ordinarily recognized in state law as a civil wrong.

■ However, the constitutional duty of the state to provide process of law is not unlimited. Certainly the state need not, and, practically, could not, require resort to process for the resolution of every private dispute.

■■ Whether process is due depends upon the application of basic constitutional principles to the case at hand. As Justice Harlan said for the Supreme Court in Boddie, supra, "The State's obligations under the Fourteenth Amendment are not simply generalized ones; rather, the State owes to each individual that process which, in light of the values of a free society, can be characterized as due." 401 U.S. at 380, 91 S.Ct. at 787.

This case involves the self-help repossession of secured tangible personal property on the debtor's alleged default.

Is process due from the state under these circumstances?

A basic purpose of American constitutionalism, and the Due Process Clause in particular, is to replace violent anarchy with a just and orderly society. The Supreme Court has stated:

> "Perhaps no characteristic of an organized and cohesive society is more fundamental than its erection and enforcement of a system of rules defining the various rights and duties of its members, enabling them to govern their affairs and definitively settle their differences in an orderly, predictable manner. *Without such a 'legal system,' social organization and cohesion are virtually impossible; with the ability to seek regularized resolution of conflicts individuals are capable of interdependent action that enables them to strive for achievements without the anxieties that would beset them in a disorganized society.* Put more succinctly, it is this injection of the rule of law that allows society to reap the benefits of rejecting what political theorists call the 'state of nature.'" Boddie, supra, 401 U.S. at 374, 91 S.Ct. at 784. (Emphasis supplied.)

Historically, one of the great missions of the law has been to bring disputes concerning the possession of real and personal property under the control of legal institutions. Except for personal injury, nothing has been so productive of contention and violence as the dispossession of tangible property. The taking of goods from another's possession, without the latter's contemporaneous consent, necessarily involves the hostile physical invasion of the possessor's personal territory, and is a serious assault upon his dignity, privacy and self-esteem. Such an invasion naturally tends to excite emotions and to provoke violent retaliation.

In the Anglo-Saxon period of English history, the law recognized, indeed, was almost entirely based upon, the concept of the personal "peace," or *grith*. The

*grith* was a person's psychological sphere of interest, marked, with regard to tangibles, by possession and control. The concern for the integrity of the *grith* was part of the common law's concern for the preservation of human dignity in the context of a stable social order. Where a person's "peace" was respected, there was an absence of violence, and the person's "peace", in its modern connotation, prevailed. In contrast, where the personal peace was breached or broken, there was contention and violence.

Because of a lack of regular, legitimate, centralized authority and power in the Anglo-Saxon period, breaches of personal peace were often legally redressed by self-help, by licensed violenced. But if the Anglo-Saxons allowed distraint in most areas of debtor-creditor relations, it was only because they lacked legal institutions to support a different rule. A significant growth in the rule of law in the modern sense occurred when the king and the people attempted to create a communal peace or, as enforced by the king and his officers, a peace of the realm. J. A. E. Joliffe, The Constitutional History of Medieval England from the English Settlement to 1485, 113–116 (4th ed. 1961). The gradual substitution of regularized justice for uncontrolled private power marked the progress of English society towards order and a higher civilization.

The concept of the personal "peace" remained implicit in the Anglo-American law, and was apparently recognized in Michigan during the nineteenth century, for example, in cases involving stray or trespassing animals. Wandering animals were a constant problem in a society of small farmers, and the remedies were closely regulated by statute. When a farmer found a trespassing animal upon his lands, he could impound it [16] and, if notice given according to the statute failed to produce the owner, he could sell it. An owner's self-help repossession of his impounded animal was referred to as a "rescue." When an impounded animal was rescued, the statute gave the farmer an action for damages and forfeiture of five to twenty dollars as against the animal's owner.

In one case, the owner rescued his impounded animal from the farmer's barn without violence or menacing or threatening words. The farmer sued for damages under the statute, but the owner claimed that the statute did not apply because the animal had been repossessed without violence. The Michigan Supreme Court, after observing that distraint had existed at common law, held that the statute applied because "*such a taking is esteemed in law a violent taking.*" Hamlin v. Mack, 33 Mich. 103, 108 (1885). (Emphasis supplied.) The Michigan Supreme Court thus followed the wisdom of the common law in recognizing that the repossession of tangible personal property from another even under a claim of right is always a violent transaction.

With the modern concentration of giant national and international corporations, characterized, like modern government, by heavy layers of impersonal bureaucracy, we are slipping backwards into disorder and fundamentally uncivilized business practices. Uncontrolled private corporate power imposes unilateral conditions and requirements on individuals in the name of contracts. Such extreme impositions necessarily erode the personal "peace," or grith, which the old law struggled for centuries to protect.

The Uniform Commercial Code allows self-help repossession by creditors "if this can be done without breach of the peace," 9–503. Breach of the peace in

16. So far as this court has been able to discover from a cursory review of the old cases, Michigan allowed distraint as a matter of law where there was no prior contract only in the case of stray or trespassing animals. In these cases, the animal was already out of the possession and control of the original owner. The impoundment of the animal protected the distrainor's crops, preserved the animal for the owner, and otherwise served the social interest in bringing strays under control.

this context usually means forcible entry into a building. By failing to establish a standard of conduct which takes into account the personal peace, the human self-esteem and dignity which surrounds an individual's personal possessions, the UCC departs from the ancient common law conception of the self-help repossession as a "violent taking." To this extent, the UCC withdraws the protection of the peace of the community from the personal peace which was the foundation of the old common law. The UCC substitutes that licensed violence which even the Anglo-Saxons strove to replace with a rule of law.

In the modern as in the ancient period, licensed but uncontrolled private violence is apt to lead to unlicensed retaliation. Many of those persons whose automobiles are most likely to be repossessed for default have lost faith in the willingness and ability of American legal institutions to protect their persons and property. Thus, when repossessors seize a car without even immediately prior notice, the natural response of the owner all too often is to retaliate violently. The plaintiffs in this case have submitted newspaper reports of automobile repossessors being killed in the streets by debtors who believed that their cars were being stolen.[17] The law certainly cannot condone such retaliatory violence, so the owner of the car becomes an accused criminal, and repossessor, usually a poor man himself, is wounded or dead. It is this type of uncontrolled violence, anarchic self-help and retaliation, that "due process of law" is intended to replace. Where the State gives its blessing to the self-interested and uncontrolled seizure of property, the rule of law is eroded, and the disruption of order is the natural result.

The UCC plainly represents an abdication of the state's responsibility.

 Establishing the legal framework for an orderly society is not the only purpose of the Due Process Clause. It is also intended to require that the procedures established for the resolution of private disputes be at least minimally just, fair and rational. In recent cases, the Supreme Court has inquired as to whether the procedures in question took sufficient account of the vital interests of both creditors and debtors. See, e. g., Sniadach, supra; Overmyer, supra; Fuentes, supra; Mitchell, supra.

The "interests" of debtors and creditors must be carefully defined as well as balanced. Some economic factors appear common to virtually all foreclosures on consumer goods in which the creditor holds a purchase money security interest. The purchaser has a possessory interest in the property, an equity to the extent the foreclosure sale price exceeds the amount due on the debt, and a title which is encumbered and defeasible. The seller or financer holds a lien on the property to the extent of the unpaid balance of the purchase price. In the event of an alleged default, the seller has an interest in seizing the property without notice and opportunity to be heard in order to prevent waste, deterioration, removal, sale, or other disposition of the security. The buyer naturally has an interest in being protected from arbitrary and unjustified seizures. Mitchell, supra, 416 U.S. at 601–610, 94 S.Ct. 1895, 40 L.Ed.2d 406.

 However, there are special factors which must be taken into account in this case. Although UCC 9–503 and 9–504 are cast in general terms, they are important parts of otherwise highly spe-

---

17. A seventeen-year old man was shot and killed and a twenty-one year old was wounded as the two were discovered by the owner trying to repossess his auto. The owner said that there had been three recent attempts to steal the car, and he believed that this was a fourth. The owner was not charged. Detroit Free Press, Aug. 2, 1973, at 8–E.

A twenty-six year old man was shot and killed in a similar incident as he attempted to repossess a car. The owner was charged with assault with intent to commit murder. Detroit Free Press, May 12, 1973, at 8–B. A jury convicted the owner of manslaughter. Detroit Free Press, Feb. 28, 1974, at 11–A.

cific regulations of automobile purchase financing. Since the state has chosen to regulate this type of transaction closely, the Due Process Clause requires that the state take special account of the interests implicated in the transactions when it establishes procedures for the resolution of conflicts.

The automobile financer is typically either a large financial institution or is backed by such an institution. Financers have overwhelming bargaining power and expertise, and automobile financing contracts are typically contracts of adhesion. Consumers have no power to insist that printed contracts be changed to require creditors to resort to process of law in conjunction with repossession for alleged default. Instead, financing contracts typically authorize creditor self-help repossession in the event of default.

In legalizing such self-help repossession contracts, the state, through its legislature, has engaged in active and effective state action by delegating both power and process to the creditors.[18] The creditor has the substantive power to declare and adjudge that the debtor has defaulted on his contract. The creditor levies on his own judgment when he repossesses the automobile, and then he conducts his own foreclosure sale, the results of which are routinely validated by the Secretary of State. Because of the economics of legal action and automobile financing, debtors as a practical matter have no legal remedy for abuses.

The brutal consequences of the exercise of this uncontrolled self-interested private power are illustrated by the case of the Grabberts, plaintiffs against Michigan National Bank. Their car was repossessed after the Bank was erroneously informed that the insurance on the vehicle had been cancelled. Although made aware of the error, the Bank required the Grabberts to pay the full amount of the loan in order to procure the return of their car. In effect, the Bank redefined default in the contract to include an erroneous report that insurance was cancelled. The Grabberts' financial condition and need for transportation was such that it would have been absurd for them to have borrowed money to sue the bank or insurance company, considering their actual damages. They refinanced the car with a small loan company at a substantially higher rate of interest.

By authorizing self-help repossessions, the state has in effect sanctioned such abuses of corporate power. The state has totally failed to accommodate the interest of debtors in avoiding mistaken and wrongful seizures.

■ Implicit in the Due Process Clause is an additional set of values for defining and measuring the interests of debtors and creditors in this case. The debtors' class in this suit includes only natural persons, while each of the creditors is a corporation. The ultimate focus of the Anglo-American legal order is the individual human being who is created by the Creator, Dec. of Ind., in the image and likeness of God, Genesis 1:26. Its basic purpose is the protection and advancement of human dignity. To this end, the Due Process Clause contemplates that legal process shall be provided to protect life, liberty, property,[19] and the pursuit of happiness. Certainly life, liberty, and happiness are the supreme human values. Property, however, is important and essential insofar as it is essential for the protection of human life and liberty and for the advancement of happiness.[20] Accordingly,

18. The question of state action is discussed more fully, infra, Part III C.

19. John Locke defined "property" to include the sum of the individual's legally cognizable attributes, "that is, his Life, Liberty and Estate." The Second Treatise of Government, Sec 87 (Laslett ed. 1960). When he wrote, "The great and chief end . . . of Mens uniting into Commonwealths, and putting themselves under Government, is the Preservation of their Property," Id. at Sec. 124, Locke was referring to this broad conception of property.

20. "For an individual man to lead a good life, two things are required. The first and most important is to act in a virtuous manner

because property is a derivative right, where the property of natural persons is at stake, the Due Process Clause requires a special inquiry to determine the impact of the deprivation of the interest on the individual. Sniadach, supra. It does not make much sense to recognize the fundamental importance of marriage and the family, see Kras, supra, 409 U. S. at 444, 93 S.Ct. 631, 34 L.Ed.2d 626, without also recognizing that families in modern industrial society require a certain level of material welfare in order to be successful institutions.

In our geographically decentralized suburban society, adequate transportation is essential for full access to work, goods, services, schools, and places of recreation. Transportation is very expensive, and it takes a substantial part of every active family's budget. Most families choose to meet their transportation needs by purchasing one or more automobiles, each of which represents a substantial commitment of funds. Given the notoriously low prices paid for repossessed goods at foreclosure sales, the repossession of an automobile means a substantial loss of investment for the individual. Most families cannot duplicate the expenditures made for an automobile without cutting back on essentials. Repossession of an automobile thus not only deprives the individual of a property interest, but also impinges directly upon his life and liberty interests and upon his pursuit of happiness.

The Supreme Court has recognized that individuals build a crucially important reliance interest in the continued use of their automobiles. In Bell v. Burson, which concerned the suspension of a driver's license, the Court said, "Once licenses are issued, . . . their continued possession may become essential in the pursuit of a livelihood," 402 U.S. 535, 539, 91 S.Ct. 1586, 1589, 29 L.Ed.2d 90 (1971). Similarly, deprivation of the use of a car can result in the loss of a job, which, no less than garnishment of wages, can be disastrous for a wage-earning family, Sniadach, supra, 395 U.S. at 341–342, 89 S.Ct. 1820, 23 L.Ed.2d 548.

Self-help repossession may infringe upon vital non-material interests of debtors as well. In our society as presently constituted, one foundation of a stable family is a safe, secure, private home. Such privacy and security are safeguarded against arbitrary governmental invasion by the Due Process Clause and the Fourth Amendment, Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), whether the government is seeking to discover or prevent crime, or to seize property pursuant to a civil action, Miloszewski v. Sears Roebuck & Co., 346 F.Supp. 119 (W.D. Mich.1972). The breaking, entering and surreptitious seizure of an automobile, under the color of law, especially if the automobile is in the debtor's driveway or near his home, necessarily involves a breach of the privacy and security of individuals and families. As the court stated in Miloszewski, supra, "This sanctity [of the home] and right to privacy are human values and human rights, and the value of the defendants' attempt to collect a debt by an unlawful search palls into insignificance by comparison with plaintiffs' human right of privacy." 346 F.Supp. at 122.

The cognizable interests of the corporate creditors in repossessing automobiles without resort to legal process are *de minimis*. Corporations are not creatures of God endowed with life and human attributes, but merely creations of the state, economic interests given separate legal status. The corporate defendants have no human rights or values at stake here, merely profit. Alteration of the present system might reduce somewhat the volume of credit, but this would not so disrupt the system as to harm any vital human interests. If

(for virtue is that by which one lives well) ; the second, *which is secondary and instrumental*, is a sufficiency of those bodily goods whose use is necessary for virtuous life." St. Thomas Aquinas, in The Pocket Aquinas, supra, n. 10, at 244. (Emphasis supplied.)

banks could no longer repossess automobiles without resort to legal process, they would not cease to exist. The system of production and distribution would certainly remain intact.

The defendants have insisted that, as a practical matter, substituting judicial supervision for self-help creditors' remedies would increase the cost and decrease the availability of credit. Since legal process is expensive and would have to be taken into account, these results would probably follow, although no one can predict precise amounts. See Mitchell, supra, 416 U.S. at 618 n. 13, 94 S.Ct. 1895, 40 L.Ed.2d 406.

An increase in the cost and a decrease in the availability of credit would no doubt adversely affect some individuals on the economic margins. However, the ultimate issue for anyone with the financial ability to make a down payment and secure credit is where to put his transportation dollar. Alternatives to owning a private car are available to most persons in urban areas. The annual cost to buy, fuel, maintain, and insure an automobile will buy a lot of bus and taxi rides. The family who invests in a private car and loses it through repossession is in a lot worse shape financially than the family which systematically exploits other means of transportation.

Although the Constitution does recognize rights to life, liberty, property, and due process of law, all of which are violated by self-help repossession, a diligent search has failed to reveal that the institutional availability of credit is a fundamental constitutional value.[21] In past years, automobile advertising has been aimed at convincing the individual that his personal worth and happiness depend upon his owning a snazzy car. Dealers offered a car for a modest down payment plus so much per week. The individual was given a title and all the liability. Upon default in payment, however, it turned out that the car really wasn't the purchaser's at all. This hustle, and the credit which supports it, does not find protection in the Constitution.

The court concludes that the processes established by UCC 9–503 and 9–504 do not fairly and rationally protect the cognizable interests of the plaintiffs in this case. The system gives little or no protection to the debtors' interests in avoiding mistaken or wrongful seizures, and to the debtors' implicated life and liberty interests in security, privacy, a minimum standard of living, and the pursuit of happiness. To the extent that the present scheme does enhance the institutional availability of credit, and to the extent that either debtor or creditor can be said to have a cognizable interest in this availability, the court concludes that this interest is outweighed by the severe damage done by the present system to the plaintiff's human rights protected by the Due Process Clause.

The whole issue can be viewed from the somewhat different perspective of relevant recent Supreme Court decisions. These decisions focused on the elements of process required to be provided under specific conditions, that is, the timing

21. There is a distinction between the "institutional availability of credit" and the ability of an individual to secure that credit which is generally available. The former is a function of the state of the economy and the policies of institutions. The ability of an individual to obtain credit when it is generally available depends upon his personal "credit rating" as ascertained by lenders, often with the help of credit reporting agencies. Modern law recognizes that each individual has a legal interest in maintaining a good credit rating. This interest is not implicated in the present suit.

The over-all availability of credit depends more upon the fiscal policies of the federal government and the monetary policies of the Federal Reserve than on the existence of self-help repossession. If the availability of credit is protected by the constitution, then numerous persons who have been unable to secure credit at moderate prices in the recent past surely have good causes of action against the Federal Reserve for driving the prime interest rate as high (at this writing) as twelve per cent.

of notice, the form and timing of hearings, and the amount of additional procedural protections to be provided debtors and creditors.

In Fuentes, supra, the Court declared unconstitutional Florida and Pennsylvania replevin statutes which provided for the issuance of writs authorizing the seizure of secured property solely on the strength of creditors' conclusory ex parte allegations to state officers. Subsequently, the Court upheld a Louisiana sequestration statute which did not provide for advance notice of repossession, but did provide judicial supervision of the process and other safeguards of debtors' interests. Mitchell, supra. The court distinguished but did not overrule Fuentes. Although the Court in Mitchell clearly desired to allow further consideration of the problem, 416 U.S. at 618–620, 94 S.Ct. 1895, 40 L.Ed.2d 406, nn. 13 and 14, for the moment Fuentes and Mitchell must be taken as stating the applicable constitutional standards.

In Mitchell, supra, the Court found that the repossession system established by the sequestration statute in New Orleans Parish protected "the debtor's interest in every conceivable way, except allowing him to have the property to start with . . . ." 416 U.S. at 618, 94 S.Ct. at 1905. It was of critical importance that Louisiana law provided for "judicial control of the process from beginning to end." Id. at 616, 94 S. Ct. at 1904. The debtor was "not at the unsupervised mercy of the creditor and court functionaries." Id. Among other things, Louisiana required that the creditor file a verified petition or affidavit stating the nature of the claim, the amount thereof, and the grounds relied upon for the issuance of the writ. The creditor was also required to post a bond to secure damages in case the writ was issued wrongfully. Immediately after seizure, the debtor had the option of moving for dissolution of the writ, thereby putting the creditor to his proofs. Id. at 606, 614–620, 94 S.Ct. at 1899, 1903–1906.

As applied to the financing of consumer purchases of automobiles, UCC 9–503 and 9–504 are vastly different from the Louisiana sequestration statutes. While Louisiana provides for judicial supervision of the repossession process from beginning to end, the UCC allows self-help repossession and provides no judicial supervision whatsoever. The debtor is at the "unsupervised mercy" of the creditor. The creditor is the party allegedly aggrieved, but he is given authority to decide that a default has occurred under the contract and to levy on his own judgment. Apart from other difficulties, this violates the elementary due process requirement of an impartial judge. Tumey v. Ohio, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927); Ward v. Village of Monroeville, 409 U.S. 57, 93 S. Ct. 80, 34 L.Ed.2d 267 (1972); Gibson v. Berryhill, 411 U.S. 564, 93 S.Ct. 1689, 36 L.Ed.2d 488 (1973).

The UCC does not provide a simple process for the debtor to put the creditor to his proofs, and to resecure possession immediately if the creditor fails to meet his burden. The possibility of a damage action or other collateral attack is not a sufficient substitute for an adequate opportunity for judicial determination of the debtor's liability before he is finally deprived of his property. Stanley v. Illinois, 405 U.S. 645, 647, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Fuentes, supra, 407 U.S. at 81–82, 92 S.Ct. 1983, 32 L.Ed.2d 556. If the debtor must initiate the suit, the burden of proof is on him, in contrast to the Louisiana situation, where the debtor need only move to dissolve the writ of sequestration to put the creditor to his proofs. Where process is originally due, a substitute in which the burden of proof is shifted will not satisfy the constitutional requirement. Armstrong v. Manzo, 380 U.S. 545, 551, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

Furthermore, an after-the-fact debtor's action for damages or possession is not practical in the overwhelming number of consumer cases. In practice,

the UCC does not even provide the debtor with the opportunity for a judicial hearing before the final deprivation of his property interest by an officer of the state. After repossession and sale of the automobile, the Secretary of State routinely completes transfer of title to the new purchaser on the strength of the creditor's ex parte affidavit that the debtor's interest was "lawfully terminated." M.C.L.A. § 257.236a(a) and (d). The absence of a meaningful opportunity for hearing violates the most fundamental requirements of the Due Process Clause. Fuentes, supra, 407 U.S. at 80, 92 S.Ct. 1983, 32 L.Ed.2d 556 and cases cited.

■ Clearly, the state's delegation of both power and process to secured creditors under UCC 9–503 and 9–504 fails to meet the state's affirmative obligation under the Michigan constitution and under the Fourteenth Amendment of the United States Constitution to provide legal process in conjunction with the forcible repossession of automobiles. The UCC provisions as applied in the context of the state's comprehensive regulation of automobile sales financing are a deliberate and unconstitutional denial of the process of law which is due the members of the plaintiffs' class in conjunction with the deprivation of their property interests.

### C.

■ State action within the meaning of the Fourteenth Amendment and the implementing statutes is present in this case. Where the individual has a constitutional right, and the state has a correlative constitutional duty which it deliberately fails to perform, there is state action. In the instant case, the plaintiffs have a right to legal process in conjunction with the repossession of their automobiles. By making UCC 9–503 and 9–504 applicable in the context of comprehensive regulations of automobile purchase financing where corporate creditors have overwhelming power, the state has deliberately denied the plaintiffs their constitutional due.

In declaring a default and executing the judgment, the corporate creditors who utilize UCC 9–503 are clearly performing traditional state functions. Even before the modern administration of the common law began to take shape governmental courts were adjudicating rights to possession of property. UCC 9–503 and 9–504 as applied to automobile repossessions represent a delegation of power and process, traditional judicial and executive functions, to corporate creditors. See Evans v. Newton, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953); Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

Moreover, the role of the Secretary of State in the scheme must be taken into account. In Michigan, ownership of automobiles is evidenced by a certificate of title, and such a certificate is ordinarily necessary to properly register a vehicle. After repossession and sale of a secured automobile, the Secretary of State issues a new certificate to the foreclosure purchaser on receipt of the appropriate documents, including the creditor's ex parte affidavit that the debtor's interest in the automobile is "lawfully terminated." The issuance of a new certificate is the final step in the repossession-sale scheme. This official action has the effect of validating for title purposes the creditor's actions in conjunction with repossession and sale of the car. Except for the circumstance that the Secretary's action comes after seizure and sale rather than before, a circumstance without significance, the Secretary's action is qualitatively the same as that of the clerk under Florida's replevin statute and of the prothonotary under Pennsylvania's. Fuentes, supra. A state officer's after-the-fact legally effective ratification of a seizure is as much state action as a before-the-fact authorization by an officer of the court.

■ In sum, the legislative authorization of private action in the context of a regulatory scheme, coupled with the executive action of the Secretary of

State to legally ratify the authorized private action, constitutes an abundance of state action within the meaning of the Fourteenth Amendment. Because the state directly authorizes the seizure of property without judicial process and then provides for the ratification of such seizures, the UCC scheme is not "neutral" in the sense of the general regulations at issue in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Rather, the legally effective ratification of private seizures by the Secretary of State is analogous to the application of sanctions by the state to enforce racially discriminatory private rules, Id. at 178–179, 92 S.Ct. 1965, 32 L.Ed.2d 627; see also, Robinson v. Florida, 378 U.S. 153, 84 S. Ct. 1693, 12 L.Ed.2d 771 (1964); Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948).

But whatever the role of the Secretary of State in automobile repossessions, the court observes parenthetically that it is slightly absurd to give intense constitutional scrutiny to rubber-stamp prejudgment clerical process on the one hand, see, e. g., Fuentes, supra, but to withhold constitutional scrutiny altogether when the state deliberately fails to establish or abolishes rubber-stamp process and substitutes completely private self-help. In reality, the two cases are not qualitatively different, and the merits of the due process question ought to be reached in both.[22]

■ The defendants are certainly proper parties within the terms of 42 U.S.C. Sec. 1983. Since they have been delegated both power and process, there is no state officer directly involved in repossession and sale.[23] Under these circumstances, it makes no difference that the defendants are private parties and not government officials. See Ad-

ickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). In repossessing automobiles without seeking judicial approval, they were acting under the authority of UCC 9–503, and thus were plainly acting under color of a state statute. To the extent that Michigan common law permits self-help repossession pursuant to contract, in the place of resort to judicial process, the defendants were also acting under color of common law.

## IV.

It is contended that the waiver of due process rights is a matter of contract and that, therefore, like other aspects of contract and property law, it is subject to definition and control by the state. In the instant case, the defendants argue that what is permitted by statute, UCC 9–503, can also be done as a matter of private contract between the parties. They argue that the legality of a contractual provision permitting the repossession of secured property without resort to judicial process is a matter of state law. See Roth, supra, 408 U.S. at 577, 92 S.Ct. 2701, 33 L.Ed.2d 548. The defendants contend that since the state permits such contracts, and permits creditors to act on them, the plaintiffs in this case have no grounds on which to complain.

■ This argument confuses property with process. The Fourteenth Amendment distinguishes the two. Property is subject to definition and control by the state, but once a person has a cognizable property interest, the process which must be invoked to deprive a person of that interest is defined by federal constitutional standards. Cf., Cohen, supra. Recently, a majority of the Supreme Court found that a governmentally-created property right could

---

22. Close examination of many debtor-creditor rights cases decided after Sniadach, supra, and Fuentes, supra, reveals that courts decide the "state action" issue according to their estimation of whether legal process is due.

23. The Secretary of State might have been joined, but considering his ex post facto role he is not a necessary party. Moreover, an injunction restraining the issuance of a new certificate of title after a foreclosure sale would unnecessarily involve the third party purchaser.

not be conditioned or limited by a statutory procedure which would permit arbitrary destruction of that right. Arnett, supra.

Where, as here, the individual debtor has a federal constitutional right to due process, he may certainly waive those rights. Overmyer, supra, 405 U.S. at 185, 92 S.Ct. 775, 31 L.Ed.2d 124. However, the validity and effectiveness of the waiver is a matter of federal constitutional law, not state contract. This is the clear import of Overmyer, Id. at 185–187, 92 S.Ct. 775, and Fuentes, supra, 407 U.S. at 94–96, 92 S.Ct. 1983, 32 L.Ed. 2d 556; cf., Fay v. Noia, 372 U.S. 391, 439, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963); Chapman v. California, 386 U.S. 18, 20–21, 87 S.Ct. 824, 17 L.Ed.2d 105 (1967).

There is no universal standard that must be applied in every situation where an individual forgoes a constitutional right. Schneckloth v. Bustamonte, 412 U.S. 218, 245, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973). The Supreme Court has not yet stated the standards which govern the waiver of due process rights in the context of civil actions for the possession of property. Fuentes, supra, 407 U.S. at 94–96, 92 S.Ct. 1983, 32 L.Ed.2d 556; cf., Overmyer, supra, 405 U.S. at 185–187, 92 S.Ct. 775, 31 L.Ed.2d 124; Schneckloth, supra, 412 U.S. at 235–246, 93 S.Ct. 2041.[24] The standard to be applied will depend upon the nature of the right being waived and the circumstances under which the alleged waiver was made.

Under the circumstances presented here, any waiver of due process rights which is not contemporaneous with the repossession may not comport with constitutional requirements. As noted above, the repossession of tangible property involves the hostile physical invasion of a person's territory, an assault upon his dignity, self-esteem, privacy and grith, and is apt to provoke retalia-

tory violence. The purpose of the Due Process Clause is to control or prevent such violence. A debtor's "waiver" of due process rights made at the time of purchase, long before any alleged default, will often not be remembered or consciously made a principle of action when the creditor attempts to repossess the automobile without notice. A contractual provision which purports to control procedural rights but which does not positively effectuate the purposes of the Due Process Clause cannot have the status of a constitutional waiver. The only such waiver would be one freely given to the repossessor at the time of repossession.

It is also important that the contracts in this case are contracts of adhesion. There is a great disparity of bargaining power, and the debtors apparently received nothing additional for the contractual self-help repossession clauses. This case is thus distinguishable from Overmyer, supra. Most households are forced to make large purchases on credit, and under these circumstances creditors are always able to insist upon "waivers" of due process rights. To give effect to such "waivers" is to turn power and process completely over to self-interested corporate creditors. This the constitution does not permit. Liberty of waiver, like liberty of contract, begins with equality of position between the parties. Cf. Coppage v. Kansas, 236 U.S. 1, 27, 35 S.Ct. 240, 59 L.Ed. 441 (1915) (Holmes, J., dissenting). The coercive nature of the unilateral conditions and requirements imposed upon purchasers of ordinary necessities of life in modern circumstances cannot be considered voluntary, understanding waivers of constitutional rights.

Assuming that the right to process can be waived in this case, the question is whether the standards for a valid waiver have been met. A natural person's right to legal process in conjunc-

24. National Equipment Rental, Ltd. v. Szukhent, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964), concerned the validity within Federal Rule of Civil Procedure 4(d)(1) of a contractual appointment of an agent to receive service of process. Since notice of service was in fact given by the agent to the principal, no due process claim was made, Id. at 315, 84 S.Ct. 411, and, presumably, none was decided.

tion with the deprivation of a property interest is certainly fundamental. What is at stake in this case is a right to any legal process in conjunction with the repossession and sale of the plaintiffs' automobiles. Since the plaintiffs' alleged waivers were made in contracts, which presumably involve some thought and reflection, neither the circumstances nor considerations of public policy require a diluted standard of waiver. Cf., Schneckloth, supra.

The court concludes that the "ordinary" standard of waiver applies in this case, "an intentional relinquishment or abandonment of a known right or privilege." Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

Have the plaintiffs in this case made a valid waiver of their right to due process? Where fundamental constitutional rights of due process are at stake, whether in a civil or criminal context, "courts indulge every reasonable presumption against waiver." Aetna Insurance Co. v. Kennedy, 301 U.S. 389, 393, 57 S.Ct. 809, 812, 81 L.Ed. 1177 (1937). In Fuentes, supra, the Supreme Court stated that "a waiver of constitutional rights in any context must, at the very *least*, be clear. We need not concern ourselves with the involuntariness or unintelligence of a waiver when the contractual language relied upon does not, on its face, even amount to a waiver." 407 U.S. at 95, 92 S.Ct. at 2002.

In this case, none of the plaintiffs' contracts contain language amounting to a waiver. Reference to available remedies under applicable law is not sufficient to indicate to the individual that he is waiving fundamental constitutional rights.

The court thus concludes that the plaintiffs have not made a valid waiver of their constitutional right to legal process in conjunction with the repossession of their automobiles.

## V.

Several additional words of explanation are necessary.

Invalidating UCC 9–503 and 9–504 will not lessen protections for debtors. Cf., Mitchell, supra, 416 U.S. at 618, 94 S.Ct. at 1905, 40 L.Ed.2d 406. When they cannot proceed under UCC 9–503 and 9–504, Michigan creditors may use the state's prejudgment replevin remedies. These have already been modified by the Michigan Supreme Court to comport with the requirements of Fuentes, supra. Michigan Supreme Court, Administrative Order No. 1973–3, 389 Mich. xliv (Feb. 2, 1973).

The present decision does not represent a revival of substantive due process. The court is not concerned with the definition of default or with which parties are ultimately entitled to the automobiles. Rather, this case, as recent cases before the Supreme Court, focuses upon the irreducible minimum of legal process which the state must provide in conjunction with the seizure of tangible personal property to satisfy a debt.

Furthermore, this decision does not mean that the state must provide judicial supervision for every involuntary transfer or impairment of a property interest. Cf., Boddie, supra, 401 U.S. at 382, 91 S.Ct. 780, 28 L.Ed.2d 113; Kras, supra, 409 U.S. at 450, 93 S.Ct. 631, 34 L.Ed.2d 626. Whether legal process is due in an individual case depends upon the nature of the parties, the transaction, and the interests involved, as well as general constitutional principles. A number of special circumstances have coalesced in this case to require the court's conclusion.

For most cases, the usual civil processes are probably sufficient under the Due Process Clause. Voluntary settlements which do not involve the arbitrary exercise of power by one party are permissible. Certainly every provision in a commercial contract which affects process or the remedy is not per se void under the constitution. See National Equipment Rental, supra.

Similarly, the court is not imposing an "inflexible constitutional rule" upon the state. Cf., Mitchell, 416 U.S. at 618,

94 S.Ct. at 1905, 40 L.Ed.2d 406. Within the minimal requirements of the Due Process Clause, the state remains free to provide for the resolution of disputes by judicial or administrative means. The state may continue to explore such alternative means of redressing injuries as workmen's compensation.

## VI.

It is ordered that the cases of Watson against Branch County Bank and Gatson against Security National Bank are hereby certified as class actions.

It is further ordered, adjudged and decreed that the plaintiffs' classes in the cases of Watson against Branch County Bank and Gatson against Security National Bank are defined as the named plaintiffs and other natural persons similarly situated whose automobiles are subject to repossession and final disposition by the respective named defendants under color of M.C.L.A. Secs. 440.9503 and 440.9504 without resort to judicial process.

It is further ordered that the defendants' motions for summary judgment are hereby denied, and the plaintiffs' motion for summary judgment is hereby granted.

It is further ordered, adjudged and decreed that UCC 9–503, M.C.L.A. Sec. 440.9503, is declared unconstitutional as applied to Edward and Shirley Ann Watson and others similarly situated by Branch County Bank; to Johnny Gatson and others similarly situated by Security National Bank; and to Barbara and James Grabbert by Michigan National Bank; and that the seizures of the named plaintiffs' automobiles by the respective defendants under color of M. C.L.A. Sec. 440.9503 but without resort to judicial process is declared to have been wrongful.

It is further ordered, adjudged and decreed that UCC 9–504, M.C.L.A. Sec. 440.9504, is declared unconstitutional as applied to Edward and Shirley Ann Watson and others similarly situated by Branch County Bank, and to Johnny Gatson and others similarly situated by Security National Bank.

It is further ordered, adjudged and decreed that injunctions issue restraining defendants Branch County Bank and Security National Bank and their officers, agents, servants, employees, attorneys, and persons in active concert or participation with them, from seizing pursuant to M.C.L.A. 440.9503 automobiles in which they hold a security interest, and from disposing of automobiles in which they hold a security interest pursuant to M.C.L.A. Sec. 440.9504, without previous resort to judicial process.

It is further ordered, adjudged and decreed that an injunction shall issue enjoining defendant Security National Bank to return Johnny Gatson's vehicle as soon as possible after the issuance of the injunction, but after such return the Bank may proceed against Gatson and the automobile through judicial process.